UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



CARLOS PEREZ,

    Plaintiff,

 -against-

THE CITY OF NEW YORK; New York City
Police Department ("NYPD") Detective
MICHAEL DONNELLY (Tax ID # 883801); and
NYPD Detective THOMAS AIELLO (Tax ID #
868427),

    Defendants.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1. Plaintiff Carlos Perez ("Plaintiff") spent almost eighteen years in prison for two murders he did not commit.

2. Plaintiff and five other individuals were wrongfully accused of the 1995 murders of a Federal Express executive named Denise Raymond and a livery taxi driver named Baithe Diop. Plaintiff, along with Michael Cosme and Devon Ayers, was convicted of both murders. Israel Vasquez was convicted for the Raymond murder only, and Eric Glisson and Cathy Watkins were convicted for the Diop murder only. These six individuals spent an aggregate total of more than a century imprisoned before their innocence was finally proven. None of them was in any way involved in the commission of either murder. Plaintiff did not even know his co-defendants before he was arrested.

3. Defendants Michael Donnelly and Thomas Aiello (collectively the "Individual Defendants") were the two NYPD detectives who led the investigation that wrongfully implicated Plaintiff and the others. Their intentional misconduct led directly to Plaintiff's

wrongful arrest, conviction, and imprisonment.  The Individual Defendants concocted a conspiracy theory according to which the two murders were related.  They manufactured the entire prosecution by coercing and bribing two "witnesses" to give false testimony that placed Plaintiff at the scene of both murders and attributed damning inculpatory statements to him.  To overcome the fact that these witnesses' false stories were self-contradictory and implausible, the Individual Defendants fed them non-public details about the murders to make them seem credible.  The Individual Defendants also suppressed evidence that would have disproven the case against Plaintiff, including surveillance footage that undermined the testimony of a third "witness" and phone records that would have implicated the real murderers.

4.     Had the Individual Defendants followed up on basic leads instead of intentionally framing six innocent people, they would have caught Mr. Diop's real murderers (who have since confessed to the crime) and prevented several heinous crimes that those individuals instead remained free to commit.

5.     The case the Individual Defendants contrived rested principally on the false testimony of three witnesses.  First, a troubled sixteen-year-old named Cathy Gomez claimed she overheard Plaintiff and others planning the murders in a secret meeting and then later bragging about their crimes in a local park.  Second, a neighborhood drug addict named Miriam Tavares claimed she witnessed the Diop homicide in intricate detail while perched on top of her toilet, peering out through a four-inch crack in her bathroom window in the dead of night.  Finally, Kim Alexander—Ms. Raymond's co-worker—testified that she saw a man named Charles McKinnon, the alleged mastermind of the Raymond murder, harassing and stalking Ms. Raymond as she left her office on the evening she was killed.

6.     This "evidence" was an elaborate farce contrived by Defendants Donnelly and

Aiello.  The testimony of all three witnesses was a product of the Individual Defendants'
imaginations.

7.      The Individual Defendants threatened, cajoled, coerced, and bribed Ms. Tavares
and Ms. Gomez to give perjured testimony.  They fed the women non-public details about both
crime scenes to bolster their credibility and coached them to lie to the Grand Jury and at trial.
Ms. Gomez has confirmed this misconduct in sworn testimony.

8.      Defendants Donnelly and Aiello also manufactured Ms. Alexander's version of
events.  Ms. Alexander's account was contradicted by surveillance footage from Ms. Raymond's
workplace, which showed Ms. Raymond and Ms. Alexander leaving work together on the night
in question—with Charles McKinnon nowhere in sight.  Defendants intentionally suppressed that
footage to ensure that the prosecution's theory of the crimes would go uncontradicted and
Plaintiff would be convicted in spite of the truth.  Plaintiff learned of this exculpatory evidence
for the first time in 2012, after it had been concealed for 17 years.

9.      After Plaintiff had spent years in prison, an independent investigation
spearheaded by the office of the United States Attorney for the Southern District of New York
blew the case wide open.  That investigation showed that two gang members, unconnected to
Plaintiff or his alleged co-conspirators, committed the Diop murder acting alone.  These
belatedly unearthed facts showed that the witnesses against Plaintiff had lied, leading the District
Attorney's Office to concede that he should be released from prison and the charges against him
dropped.

10.     This is a civil action pressing claims pursuant to 42 U.S.C. § 1983, the Fourth and
Fourteenth Amendments to the United States Constitution, and New York law.  This action seeks
monetary damages for Plaintiff's unlawful arrest, malicious criminal prosecution, wrongful

conviction, and imprisonment due to violations of his fundamental federal constitutional rights to due process and to be free from unreasonable search and seizure.

11.     The Individual Defendants instigated and continued the prosecution of Plaintiff without probable cause to believe Plaintiff to be guilty of the crimes charged, failed to turn over exculpatory evidence to the District Attorney's Office, and manufactured evidence through highly-suggestive, unfair, and unreliable investigative procedures that tainted alleged witnesses' recollections and encouraged perjured testimony.  Their conduct led to the wrongful and unjust prosecution of Plaintiff.

12.     Defendant the City of New York (the "City") is liable for violations of state law perpetrated by its employees under the doctrine of *respondeat superior*.

## PARTIES AND JURISDICTION

13.     This Court has original subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiff's claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of State law, of rights guaranteed by the Constitution of the United States.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     Plaintiff  has complied with the requirements of New York General Municipal Law Section 50-i by serving on the Office of the Comptroller of the City of New York a notice of claim on March 7, 2013 and an amended notice of claim on October 10, 2013.  More than 30 days have elapsed since Plaintiff served those notices of claim and no offer of settlement has been made.

16.     Plaintiff submitted to a hearing pursuant to New York General Municipal Law

Section 50-h on December 9, 2013.

17.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims arose in this judicial district.

18.     At all times herein mentioned, Plaintiff was a resident of the County of the Bronx, City and State of New York.

19.     Defendant City of New York ("City") is a municipal corporation existing by virtue of the laws of the State of New York.

20.     Defendant Michael Donnelly, Tax I.D. No. 883801, was at all relevant times a detective employed by the NYPD.  He is named here in his individual capacity.

21.     Defendant Thomas Aiello, Tax I.D. No. 868427, was at all relevant times a detective employed by the NYPD.  He is named here in his individual capacity.

22.     At all times relevant to this Complaint, the aforementioned Defendants acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Procedural History of Underlying Criminal Cases

23.     The underlying criminal cases involved two homicides that occurred in the Bronx in January 1995.

24.     The first of these homicides was an execution-style murder of a Bronx woman, Denise Raymond, which occurred on the evening of January 17, 1995.

25.     Two days after Ms. Raymond's death, a livery cab driver, Baithe Diop, was shot to death at the wheel of his taxi on January 19, 1995.

26.     Although there was no evidence to link the two crimes, the Individual Defendants

maliciously conspired to present false evidence that both of these crimes were committed by the same people.

27.     On February 10, 1995, Plaintiff was sitting on the stoop of his apartment building in the Bronx holding his baby when he was swarmed by plainclothes police officers with guns drawn.  The officers screamed for Plaintiff to "freeze, motherfucker!"

28.     Defendants Donnelly and Aiello then unlawfully arrested Plaintiff.  While transporting him to the police station, the Individual Defendants falsely informed Plaintiff that he was being arrested for bank robbery.  The Individual Defendants brought Plaintiff to the 43rd Precinct, where he was handcuffed to a bench.  He was never Mirandized.

29.     At the precinct, Defendants Donnelly and Aiello repeatedly referred to Plaintiff as "Kojak," a nickname that was totally unfamiliar to him.

30.     The next day, Defendants Donnelly and Aiello brought Plaintiff to participate in a line-up.  Only then was Plaintiff informed that he was accused of murder.  None of the other individuals in the line-up physically resembled Plaintiff.

31.     After the line-up, Plaintiff heard the Individual Defendants state repeatedly that he was "Kojak."  It sounded like a joke.

32.     Defendants Donnelly and Aiello then transported Plaintiff to Central Booking. While they were en route, Plaintiff demanded to know why he was being framed.  The Individual Defendants told him to "shut up, Kojak."

33.     After the Individual Defendants conspired to create false evidence that Ms. Raymond's murder and Mr. Diop's murder were committed by the same individuals, Plaintiff was indicted for both murders on March 14, 1995 (Bronx Indictment No. 1086/95).

34.     Plaintiff had never even met Israel Vasquez, Michael Cosme, Devon Ayers, Eric

Glisson, Cathy Watkins, or Charles McKinnon before he was arrested.

35.     Plaintiff continued to maintain his innocence and pled not guilty.  Following a jury trial conducted by Assistant District Attorney Daniel McCarthy in the Supreme Court, Bronx County, Plaintiff was convicted on March 5, 1997 by a jury on one count of murder in the second degree and one count of second degree felony murder for the killing of Ms. Raymond, as well as one count of murder in the second degree and one count of second degree felony murder for the killing of Mr. Diop.

36.     At his May 12, 1997 sentencing hearing, Plaintiff told the judge that case against him had been "nothing more than a fabrication."  He specified that Cathy Gomez had "lied and lied against me at trial" and insisted that he was "an innocent man."  "And sir," he told the judge, "I did not commit this crime.  I was framed."

37.     Plaintiff informed the court that Defendant Donnelly, whom he referred to as "a ruthless crooked homicide cop," was "never interested in finding the truth about this case."  He stated his hope that "someday whoever killed these people will be brought to justice for my sake and for the sake of their family."  He also expressed his hope that "those responsible for framing me and those responsible for the cover-up, and those that conspired with Detective Donnelly, Detective Aiello, [and] ADA McCarthy to fabricate evidence against me to build this whole fictitious case someday will be brought to justice."

38.     Plaintiff was sentenced to two concurrent prison terms of twenty-five years to life.

39.     Plaintiff appealed his conviction.  On May 4, 2000, the Appellate Division, First Department, unanimously affirmed Plaintiff's judgment of conviction and sentence.  *People v. Perez*, 272 A.D.2d 86 (N.Y. App. Div. 2000).

40.     Plaintiff, acting *pro se*, then petitioned for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  On September 25, 2002, that petition was denied by Judge Alvin K. Hellerstein of the United States District Court for the Southern District of New York.  *Perez v. Greiner*, No. 01 Civ. 5522, 2002 WL 31132872 (S.D.N.Y. Sept. 25, 2002).

41.     On December 12, 2012, Plaintiff's convictions respecting the Diop murder were finally vacated, and the corresponding counts of the indictment against him dismissed, on the consent of the Bronx District Attorney's Office after evidence came to light proving his innocence.

42.     Plaintiff was released from prison on January 23, 2013 after the Bronx District Attorney's Office agreed that his convictions for the Raymond murder should also be vacated.

43.     Plaintiff spent almost eighteen years in prison for crimes he did not commit.

44.     On September 20, 2013, the indictment against Plaintiff was dismissed in its entirety.

### The 1995 Police Investigation

45.     Denise Raymond came home to her apartment, in the Soundview area of the Bronx, after work on the evening of January 17, 1995.  Based on the crime scene investigation, it appeared that Ms. Raymond was accosted as she entered her apartment on Boynton Avenue in the Bronx, after which she was dragged to her bedroom, handcuffed, blindfolded, gagged, and then shot twice in the head.

46.     Two days later, at approximately 4:30am on January 19, 1995, Baithe Diop—a Senegalese livery taxi driver who had no connection to Ms. Raymond—was found dead in his cab on Croes Avenue between Lafayette and Seward Avenues in the Bronx.  He had been shot twice, once in the upper back and once in his right side.

47.     Defendants Donnelly and Aiello, detectives employed by the NYPD, investigated

the two homicides.  Defendant Aiello was the lead detective assigned to the Raymond murder, while Defendant Donnelly was the lead detective assigned to the Diop murder.  The two worked together closely and investigated the crimes in tandem.   New York Magazine published a feature article called "How to Solve a Murder," which discussed the investigation into the two murders and the Individual Defendants' collaborative efforts.  The two detectives worked together so closely that the prosecution at Plaintiff's trial even treated them as the same person, stipulating that the defense could "pose any questions to Donnelly which they could pose to Aiello, and I'm not going to object on the grounds that it's Donnelly versus Aiello."

48.     During the investigation, the Individual Defendants repeatedly questioned two supposed "witnesses": a teenager named Cathy Gomez and a woman named Miriam Tavares.

49.     In January 1995, Ms. Gomez was repeating ninth grade for the second time; she would never complete it.  She was enrolled in school, but she rarely attended class and could not read or write English.

50.     Ms. Tavares was a neighborhood drug addict who spoke only Spanish.

51.     Playing on the two women's vulnerabilities, Defendants Donnelly and Aiello coerced, cajoled, threatened and bribed them to provide what the Individual Defendants knew was false testimony with the purpose of obtaining Plaintiff's unlawful arrest, wrongful conviction, and unjust imprisonment.

52.     The Individual Defendants also relied heavily on a third alleged witness, Kim Alexander.  Ms. Alexander had been a co-worker of Denise Raymond's.  She claimed that she left work with Ms. Raymond on January 17, 1995, shortly before Ms. Raymond was murdered.  Ms. Alexander claimed that as she and Ms. Alexander exited their office building, an African-American man (whom she subsequently identified as Charles McKinnon) appeared and began

harassing Ms. Raymond.  Ms. Alexander's story bolstered the Individual Defendants' theory that

Mr. McKinnon masterminded the Raymond murder and ordered Plaintiff and his co-defendants

to carry it out.

53.     But Mr. McKinnon had not been at Ms. Raymond and Ms. Alexander's

workplace the night of the murder, and the Individual Defendants knew it.  Defendant Aiello had

viewed surveillance footage from the building, recorded on the night in question, which showed

Ms. Alexander and Ms. Raymond leaving together—and showed Ms. Raymond wearing the

exact outfit and carrying the exact parcels Ms. Alexander's testimony described—with no

African-American man anywhere in sight.  Knowing this evidence would undermine the

fabricated case against Plaintiff and his co-defendants, Defendant Aiello suppressed the footage

and falsely told prosecutors it showed nothing of value to the investigation.

54.     Defendants used a series of unconstitutional and improper tactics to secure

Plaintiff's indictment and conviction.  These tactics included, but were not limited to:

questioning Cathy Gomez and Miriam Tavares together and using Ms. Gomez as a translator for

Ms. Tavares, thereby tainting both women's accounts; feeding Ms. Gomez and Ms. Tavares

details about the crime scenes and police investigation that were unknown to the witnesses and

then coercing them to testify that they learned the information from Plaintiff and his co-

defendants; threatening to unjustifiably jail Ms. Gomez's parents and interrogating her younger

brother and threatening to prosecute him; using suggestive witness identification procedures;

giving both women, who were indigent, financial incentives to provide false incriminating

evidence; and failing to turn over exculpatory evidence, including the surveillance video that

disproved Ms. Alexander's testimony, to the prosecution.  The Individual Defendants knew the

testimony upon which the case against Plaintiff relied was false.

### Cathy Gomez

55.    In order to achieve their goal of inculpating Plaintiff, the Individual Defendants forced Cathy Gomez to lie about his involvement in the Raymond and Diop murders.

56.    Even before Plaintiff was arrested, Ms. Gomez specifically told Defendant Donnelly that she had no independent personal knowledge of any facts relating to the Raymond murder.  Indeed, she did not even know the murder occurred until Defendant Donnelly told her about it.

57.    Yet after meeting repeatedly with the Individual Defendants, Ms. Gomez gave a slew of false statements concerning Plaintiff and his co-defendants, including both before the Grand Jury and at trial.

58.    For example, Ms. Gomez testified before the Grand Jury that Plaintiff was nicknamed "Kojak" and was a known drug dealer who always carried a lollipop.  She stated that he was a key figure in the Raymond and Diop homicides, and was present at a secret meeting at Michael Cosme's apartment where the murders were planned.  She stated that "Kojak" was also present in a neighborhood park the day after the Raymond murder, where he discussed having committed the murder with his confederates.  She stated that she saw "Kojak" at the park again the day after the Diop murder, and observed him and others bragging about their role in both murders.  She claimed that "Kojak" had admitted to being in Ms. Raymond's apartment and pistol-whipping her before she was murdered.

59.    Ms. Gomez gave this false testimony because she was forced to lie by the Individual Defendants.  The Individual Defendants met with Ms. Gomez repeatedly, coaching her to make false statements implicating Plaintiff in the Raymond and Diop murders.  It was they who came up with the false stories about the planning meeting and the conversations in the park.

11

60.     Because her testimony was manufactured by the Individual Defendants and not

actually a statement of her personal knowledge, it was largely incoherent and self-contradictory.

61.     Nevertheless, the prosecution assured the jury at Plaintiff's trial that—in spite of

problems with her testimony—Ms. Gomez must have been telling the truth because she

otherwise could not have known several non-public details about the murders.  For example, she

knew about specific items that were stolen from the victims (a VCR and a credit card from Ms.

Raymond, a cell phone from Mr. Diop), and she knew that Ms. Raymond's murderers had drunk

juice and snacked on sandwiches in Ms. Raymond's apartment after shooting her.

62.     Ms. Gomez has since admitted that she did not actually learn these details from

Plaintiff and his co-defendants; rather, she learned them from Defendants Donnelly and Aiello.

The Individual Defendants showed Ms. Gomez crime scene photographs.  They told her about

specific items that were stolen from the victims, and explained that crime scene evidence

suggested that Ms. Raymond's murderers had eaten sandwiches and drunk juice in her apartment

during or after the murder.

63.     The Individual Defendants then forced Ms. Gomez to lie and claim that her

knowledge of these and other details came from inculpatory statements she overheard Plaintiff

and his co-defendants making.

64.     Ms. Gomez's testimony was entirely fabricated.  She now admits that she had

never been to Michael Cosme's house, much less witnessed a meeting at which two murders

were planned; that she had never overheard anyone admitting to perpetrating the Raymond or

Diop murders; and that she learned about the sandwich and juice, the stolen items, and other non-

public crime scene details from the Individual Defendants.  Plaintiff never admitted his

involvement, because he is innocent.  Ms. Gomez has now admitted all of this in sworn

testimony and has confirmed that she was forced to lie by the Individual Defendants.

65.     Ms. Gomez's recantation has been corroborated by her brother, Hanley Gomez,

Jr.  As with Ms. Gomez, during their "investigation" Defendants Donnelly and Aiello attributed

statements to Mr. Gomez that he had never made and caused him to sign them without

understanding their contents.  But unlike his sister, Mr. Gomez resisted the Individual

Defendants' threats and coercion and refused to participate in the Grand Jury and trial

proceedings against Plaintiff (and tried unsuccessfully to convince his sister to do the same)

because he knew the facts attributed to him and to his sister were false.  Since at least 2004, Mr.

Gomez has maintained that the Individual Defendants coerced him to sign statements without

understanding their contents and forced his sister to perjure herself.

66.     When Ms. Gomez tried to refuse Defendants' demands that she give false

testimony, they threatened her and warned her that her family would get in trouble if she got

"stupid."  Defendant Donnelly threatened Ms. Gomez that her brother would be accused of the

murders if she did not cooperate in the Individual Defendants' scheme to frame Plaintiff and his

co-defendants.  Defendants Donnelly and Aiello threatened to jail Ms. Gomez and to have her

parents deported if she did not provide perjured testimony to further their fabricated theory of the

case.

67.     Ms. Gomez testified falsely because she was threatened, coerced, and intimidated

by the Individual Defendants to lie.  Defendants Donnelly and Aiello knew that her testimony

was false.

68.     Plaintiff was arrested, prosecuted, and convicted largely on the basis of Ms.

Gomez's false statements, which were fabricated by the Individual Defendants.

**Miriam Tavares**

13

69.     Ms. Tavares's testimony was also fabricated by the Individual Defendants.  They arrested and prosecuted Plaintiff for the Diop murder largely on the basis of Ms. Tavares's fabricated statements, even though those statements were uncorroborated and implausible and even though the Individual Defendants knew them to be false.

70.     At the Individual Defendants' behest, Ms. Tavares claimed that she witnessed the Diop homicide in intricate detail while perched on top of her toilet, looking out through a four-inch crack in her bathroom window 300 feet away from where Mr. Diop's vehicle crashed after he was shot.  She claimed that Plaintiff and at least five other people surrounded the cab, shot Mr. Diop, and stole his belongings.

71.     The information attributed to Ms. Tavares changed drastically over the course of the "investigation."  With each new statement, Ms. Tavares added new details and changed other ones, placed new "perpetrators" at the scene, and inserted narrative flourishes that rendered her account a cartoonish farce.  This evolution in Ms. Tavares's account was attributable to the coaching of Defendants, who encouraged her to lie.

72.     Over the course of multiple statements to the police, three separate days of Grand Jury testimony, and trial testimony, Ms. Tavares's story changed wildly.  Her first statement claimed that she was lying down putting her son to bed at the time of the Diop murder, heard a gunshot, and thereafter walked to her bathroom window where she observed a second shot and saw two individuals—neither of whom was Plaintiff—running towards her.  Indeed, it was not until the *third time* Ms. Tavares testified before the Grand Jury (in addition to the several statements she had given to the police)—that she ever mentioned "Kojak" being present at the Diop murder scene.  In her third day of Grand Jury testimony, Ms. Tavares suddenly remembered not only that "Kojak" participated in the murder, but that he made a slashing gesture

across his neck, instructing his companions to kill the taxi driver.  She had never mentioned "Kojak" in any of her numerous previous statements to the police or to the Grand Jury.

73.    Indeed, between her first conversation with the Individual Defendants and her trial testimony, Ms. Tavares's account added numerous precise details about the exact manner in which she claimed to have seen the murder unfold.  Over the course of more than half a dozen statements, Ms. Tavares changed: the number of "perpetrators" who were present; whether any of those individuals gesticulated or made verbal statements, and what they were; where the shooters were positioned; whether the "perpetrators" were holding items and what they were; what items were taken from inside the cab and who took them; how many vehicles were present and who was in them; and numerous other details.  At trial, she even mentioned for the first time that she was sitting outside on her stoop when Mr. Diop's taxi pulled up near her building, enabling her to see everyone who was present in pristine detail.  She also testified for the first time at trial that Plaintiff had called out verbally for the others to kill Mr. Diop.

74.    Ms. Tavares's account was completely divorced from the reality of what the Individual Defendants knew or should have known about the Diop murder based on objective evidence.  For example:

   a.    Ms. Tavares claimed that Mr. Diop's taxi was stationary outside her apartment when the shooting occurred.  But crime scene evidence showed that the taxi was still moving when Mr. Diop was shot and subsequently traveled several hundred feet, colliding with several objects along the way, before coming to rest.  The actual scene of the shooting was not visible *at all* from Ms. Tavares's vantage point.  The Individual Defendants intentionally ignored this obvious fact and failed to even review the crime scene report.

   b.    Ms. Tavares stated that Mr. Diop was first shot in the legs by someone standing outside of the driver's side of the cab.  But the crime scene evidence, of which the Individual Defendants were or should have been aware, showed that Mr. Diop was shot twice, once in his upper back and once on his right side (*i.e.* by two people seated in the back seat, one directly behind him and one seated on the rear passenger side of the vehicle).

15

c. Ms. Tavares stated that six perpetrators were present at the crime scene, but two other eyewitnesses had told the police that they only saw one or two individuals fleeing. The Individual Defendants failed to follow up with the other two eyewitnesses.

75. The Individual Defendants knew that Ms. Tavares's fake story was not a valid basis to suspect Plaintiff of wrongdoing. They knew it because it was they who told her to lie. The variations in Ms. Tavares's statements, and their inconsistency with the physical evidence, are attributable to the fact that she was not actually describing events she had observed. Rather, she was imperfectly attempting to regurgitate a story that Defendants had fed to her. On at least one occasion, Defendant Donnelly even hand-wrote a statement to be signed by Ms. Tavares, who could not read or understand English. There is no evidence that the statement was ever translated for her.

76. The Individual Defendants gave Ms. Tavares, who was destitute, financial incentives to give false testimony. They also exploited her personal bias against Eric Glisson, one of Plaintiff's alleged co-conspirators, to procure false inculpatory testimony. The Individual Defendants knew that Ms. Tavares's statements were completely fabricated.

77. As they had with Ms. Gomez, the Individual Defendants fed non-public details about the murders to Ms. Tavares to make her otherwise implausible, inconsistent testimony appear credible.

78. But Mr. Diop was not murdered by Plaintiff or by any of his co-defendants. He was murdered by two gang members, acting alone, who later confessed. None of the people Ms. Tavares accused had anything to do with the murder.

79. That fact came to light when the office of the United States Attorney for the Southern District of New York ("USAO") re-investigated the Diop case in response to pleas from Eric Glisson, one of the other individuals Tavares accused. Using investigative techniques

16

that Defendants should have utilized in 1995 had they been acting with ordinary investigative competence, the U.S. Attorney's investigation solved the Diop murder and exonerated Plaintiff and his co-defendants.

80.     In the late 1990s and early 2000s, the USAO was involved in dismantling a street gang called "Sex, Money, Murder."  Gilbert Vega and Jose Rodriguez were two members of that gang and had become cooperating witnesses when the federal authorities indicted members of the gang.

81.     As part of that cooperation, Vega and Rodriguez were required to admit all of their past criminal activity, and by 2003 both had confessed to shooting and robbing a livery cab driver on Croes Avenue in the Bronx in the winter of 1994-1995.  Following these confessions, the federal authorities spoke multiple times to the detective squad at the 43rd Precinct, where Defendants Donnelly and Aiello worked, attempting to confirm Vega and Rodriguez's information and to close what they imagined was an unsolved shooting investigation.

82.     No one at the 43rd Precinct or Bronx Homicide told the federal authorities about the Diop case, even though Detective Donnelly worked for the Bronx Homicide Task Force in 2003.  The federal authorities were instead told that no files matched the facts Vega and Rodriguez had provided.

83.     In the spring of 2012, the USAO learned for the first time from Eric Glisson that he, Plaintiff, Cathy Watkins, Michael Cosme, and Devon Ayers were in prison for a murder that bore an uncanny resemblance to the taxi driver murder to which Vega and Rodriguez had confessed years earlier.

84.     The USAO's chief investigator on the case has noted that "every undisputed fact regarding the Diop homicide corresponds to and corroborates the account given by" Vega and

Rodriguez, including the time and approximate date of the shooting, the fact that the victim was an African livery cab driver, the pick-up and drop-off locations, the "exact location" of the shooting, the ballistics, crime scene, and medical evidence, Mr. Diop's screams as the robbery unfolded, the cab's collision with a parked car and a trash dumpster, and the theft of a cell phone from the driver (with calls made to associates of Vega and Rodriguez).

85.     That investigator has also observed that the case against Plaintiff and his co-defendants rested heavily on "the testimony of Miriam Tavarez [sic], a witness with an obvious bias, who told materially different stories on different occasions, whose testimony was inconsistent with the physical evidence, and who gave what I believe, based on my experience and my familiarity with the location of the homicide, to be highly questionable testimony about her ability to perceive the events of that night and what she actually did see, if anything."

86.     Had the Individual Defendants conducted a proper investigation, Vega and Rodriguez would have been imprisoned for the Diop murder instead of Plaintiff and his co-defendants.  For example, the Individual Defendants could have reviewed phone records showing calls made from Mr. Diop's stolen cell phone after he was murdered.  The police possessed those records at the time of the 1995 investigation.  Those records would have shown, and do show, that Mr. Diop's phone was used to make several calls to associates of Vega and Rodriguez, who were notorious members of a violent gang that operated in the neighborhood where Mr. Diop was shot.  In fact, one call was made to the home of Rodriguez's mother—where Rodriguez and Vega were both living at the time.

87.     Plaintiff's defense was never provided with these exculpatory phone records at the time of his criminal trial.

88.     Because the Individual Defendants were too busy knowingly concocting a false

18

case against Plaintiff and his co-defendants, and relying on statements by Ms. Tavares which they knew to be false, the Individual Defendants failed to exercise the basic competence that would have solved the Diop murder.  That left the true perpetrators, Vega and Rodriguez, free to continue committing violent crimes in the Bronx for years.  For example, Jose Rodriguez was one of the shooters in the infamous "Thanksgiving Murders" in November 1997 in the Bronx, in which two people were killed during an annual football game between residents of two public housing complexes.

89.     Instead of apprehending Vega and Rodriguez and preventing these later murders, the Individual Defendants framed Plaintiff, causing him to spend almost eighteen years in prison for crimes he did not commit.

### Kim Alexander's Testimony and Defendants' Withholding of *Brady* Material

90.     The third key "witness" against Plaintiff was Kim Alexander, who testified that she had witnessed a man she identified as Charles McKinnon harassing Ms. Raymond as Ms. Raymond left work on the night she was murdered.

91.     To support the charges against Plaintiff, the Individual Defendants sought to establish a link between Mr. McKinnon and Ms. Raymond—who knew each other and who had been romantically involved a number of years before the murder—and to link Mr. McKinnon to Plaintiff and his co-defendants, Israel Vasquez, Devon Ayers, and Michael Cosme.  They invented "facts" to "show" that Plaintiff and his co-defendants carried out the Raymond murder at Mr. McKinnon's behest.  It was the only attempt ever made to establish a motive for Plaintiff to show up at the apartment of Ms. Raymond, a stranger, and participate in her murder.

92.     Defendants pursued this strategy because there was no evidence to connect Plaintiff and his co-defendants to Ms. Raymond.  Plaintiff was an unemployed family man who

lived with his children at the time of the murder, while Ms. Raymond was a thirty-eight-year-old Federal Express executive.  There was no evidence to connect Plaintiff and his co-defendants— all teenagers or young men—with Ms. Raymond, who moved in entirely different social circles.

93.     To support their strategy, the Individual Defendants forwarded information to prosecutors purporting to demonstrate that Mr. McKinnon stalked and harassed Ms. Raymond immediately prior to her death, and that he orchestrated the murder with what Defendant Aiello described as a group of "younger boys."

94.     Defendants relied on Ms. Alexander, Ms. Raymond's co-worker, who testified before the Grand Jury, at Plaintiff's trial, and at the trial of Charles McKinnon, to support their theory that McKinnon orchestrated Ms. Raymond's death.

95.      According to Ms. Alexander, she and Ms. Raymond left work together on the evening Ms. Raymond was killed.  She testified that as they waited on an upper floor of the Federal Express building for the elevator, a man, whom Ms. Raymond apparently knew, but who was a stranger to Ms. Alexander, suddenly appeared.  Ms. Alexander testified that she remained with Ms. Raymond and the man as they waited for the elevator.  The three then rode the elevator down to the lobby together, and exited the building at the same time.

96.     Ms. Alexander testified that Ms. Raymond appeared upset and agitated with the man throughout the entire encounter, and told him to leave her alone.

97.     Ms. Alexander testified that the man followed Ms. Raymond as she walked away from their office building, and that after this encounter, she never saw Ms. Raymond alive again.

98.     Ms. Alexander described the man in the elevator as a tall dark skinned man in his mid-thirties to early forties, wearing a trench coat.  Using highly suggestive identification methods, Defendant Aiello eventually managed to convince Ms. Alexander to identify that man

as Mr. McKinnon.

99.    Ms. Alexander presented powerful evidence to the Grand Jury and at Plaintiff's trial to establish that Mr. McKinnon "set up" Ms. Raymond to be killed by Plaintiff and his co-defendants.

100.    At Plaintiff's trial, Ms. Alexander's testimony was the sole evidence presented regarding Mr. McKinnon's alleged contact with Ms. Raymond on the night of the murder.

101.    This alleged meeting between Ms. Raymond and Mr. McKinnon was also the sole overt act alleged in the indictment to have been committed by Mr. McKinnon to support a charge of conspiracy between Mr. McKinnon, Plaintiff, and the other defendants.

102.    But the basis for this conspiracy theory was completely false.  Mr. McKinnon never had an encounter with Ms. Raymond and Ms. Alexander on the night Ms. Raymond was murdered—and the Individual Defendants knew it.

103.    Security surveillance footage from the Federal Express office building in Manhattan showed that Ms. Alexander and Ms. Raymond left the elevator together, alone, on the night in question.  Mr. McKinnon was nowhere in sight.

104.    The Individual Defendants knew that their conspiracy theory was false because, shortly after Ms. Raymond's murder, Defendant Aiello viewed the security tapes at the Federal Express building and took possession of the tapes.  He knew that Ms. Raymond did not encounter Mr. McKinnon on the night of her murder, as Ms. Alexander claimed, because he saw Ms. Alexander and Ms. Raymond exit the elevator and the office building on the night of the murder with no black man present.  Upon information and belief, Defendant Donnelly also knew that the security tape undermined Ms. Alexander's testimony and he conspired with Defendant Aiello to withhold the tapes.

105.    Knowing that this evidence completely undermined their conspiracy theory against Plaintiff and his co-defendants, the Individual Defendants deliberately suppressed the security tapes by failing to "voucher" them in violation of NYPD policy and falsely informing the prosecutor, ADA Daniel McCarthy, that the footage showed nothing relevant to the investigation.

106.    Defendant Aiello completed a Police Department report falsely claiming that Ms. Raymond did not appear on the security tape.  As a result, Plaintiff, the Grand Jury, and the trial jury never knew that there existed objective evidence contradicting the prosecution's theory that Mr. McKinnon orchestrated and set up Ms. Raymond to be murdered by Plaintiff and his co-defendants.

107.    These tapes should have been turned over to the defense at Plaintiff's trial under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  The footage undermined the prosecution's theory that Charles McKinnon orchestrated the Raymond murder and enlisted Plaintiff, Mr. Cosme, Mr. Ayers, and Mr. Vasquez to carry it out.  But this evidence was never disclosed to Plaintiff at any point, including while he was appealing his wrongful conviction.

108.    More than one year after Plaintiff's conviction, Ms. Alexander testified at McKinnon's trial and presented testimony that was the same in sum and substance as her testimony during Plaintiff's trial.

109.    At the close of evidence in the McKinnon trial, and in response to the Court's inquiry, the prosecutor (based on false information provided by Defendant Aiello) represented to the Court that Defendant Aiello had met with Ms. Alexander to view a surveillance tape at the Federal Express building, but did not take the tape into police custody because Defendant Aiello did not see Ms. Raymond, Ms. Alexander, or Mr. McKinnon on the tape.

22

110.    The Court ordered the prosecutor to once again "specifically ask" Defendants

Donnelly and Aiello whether they had taken the tape into police custody, and whether Ms.

Raymond did, in fact, appear on it.

111.    At the same time, the Court gave permission for McKinnon's defense attorney to

call an additional witness, a Federal Express security guard, referred to as "Mooney."

McKinnon's defense attorney stated that this guard would testify that he viewed the surveillance

tape with Defendant Aiello and Ms. Alexander; that the tape had, in fact, been taken into police

custody by Defendant Aiello; and that it showed Ms. Alexander and Ms. Raymond exiting work

alone.

112.    Only then did Defendant Aiello admit to the prosecutor that he had, in fact, taken

possession of the tape.  The prosecutor then disclosed the tape to Mr. McKinnon's counsel.

113.    After the tapes were disclosed for the first time at the close of Mr. McKinnon's

trial, the Court held that the tapes were *Brady* material, and that it was a "serious" violation to

fail to produce this evidence.  The Court stated that the failure to turn over the tape sooner was

grounds for a mistrial.

114.    During the McKinnon trial, the parties stipulated that Defendant Aiello had

concealed evidence from the Bronx District Attorney's Office, which resulted in the prosecutor's

failure to disclose this *Brady* material.  The stipulation, in effect, stated that Defendant Aiello

lied by telling the prosecutor that he had viewed the tape but did not seize it, and by telling the

prosecutor that he "did not see the deceased, Kim Alexander or [McKinnon]" in the tape, when

in fact the tape showed Ms. Alexander and Ms. Raymond leaving the elevator together with Mr.

McKinnon nowhere in sight.

115.    During their deliberations, the jury in Mr. McKinnon's trial asked to hear all the

23

testimony about Ms. Raymond's departure from her office on the day of her death again and asked numerous questions about the footage.  Then, having heard the exculpatory evidence at Mr. McKinnon's trial—as well as the fact that the lead detective in the Raymond investigation, Defendant Aiello, had concealed evidence from the prosecutor—the jury acquitted Mr. McKinnon of all charges.

116.   The exculpatory evidence was never produced at Plaintiff's trial or at any point during Plaintiff's appeal of his conviction, even though Ms. Alexander presented substantively identical testimony at Plaintiff's trial and before the Grand Jury as she had at Mr. McKinnon's trial.

117.   During Plaintiff's trial, the jury was never informed that Mr. McKinnon did not, in fact, illicitly enter Ms. Raymond's workplace the night of her murder, argue with her, and then follow her home.  They were left with uncontradicted evidence supporting the prosecution's theory that Mr. McKinnon had a strong motive for the murder, and that he then conspired with Plaintiff to carry out the murder.

118.   Had this *Brady* material been presented to the Grand Jury or during Plaintiff's trial, as it should have been, he would not have been prosecuted or convicted, much less remained wrongfully incarcerated for almost eighteen years.  Once Ms. Alexander's testimony had been discredited, there was not a shred of evidence to establish that Plaintiff had a motive for Ms. Raymond's murder.  Indeed, there was no evidence to connect Plaintiff to Ms. Raymond in any way.

### Defendants' Malice and Deliberate Indifference

119.   The Individual Defendants' failure to undertake even basic investigation tasks confirms their indifference to Plaintiff's innocence and their improper reliance on testimony they

knew to be false.  For instance, the Individual Defendants never went to Ms. Tavares's apartment to see whether it was even possible for Ms. Tavares to observe what she claimed to have seen from her apartment.  They never followed up with other witnesses whose versions differed starkly from Ms. Tavares's description.  They did not review the Diop crime scene report, which would have showed that Mr. Diop's cab moved hundreds of feet after he was shot, undermining Ms. Tavares's claim that she could see where the shooting occurred from her apartment.

120.    Defendants' malice is confirmed by their behavior throughout the investigation. They deliberately ignored investigative leads that would have proved Plaintiff's innocence.  For instance, Defendants never questioned or otherwise investigated an individual who pawned a bracelet with the word "Denise" and Ms. Raymond's birthday engraved on it shortly after Ms. Raymond's murder.  They never followed up on records of outgoing calls made from Mr. Diop's stolen cell phone—which would have led them to the real shooters, Vega and Rodriguez.  Nor were those records ever turned over to Plaintiff's criminal defense counsel.

121.    The Individual Defendants also relied exclusively on obviously unreliable and inconsistent witness statements; invented a connection between two unrelated murders without any evidentiary basis; threatened witnesses to obtain testimony favorable to their theory; used one witness as a language interpreter for another, despite the obvious risk that each witness's account would be tainted; fed non-public crime scene details to the "witnesses" to make them appear more credible; and failed to voucher the surveillance tape, among other misconduct.

122.    The Individual Defendants also used patently unreliable identification techniques. For instance, they showed Ms. Gomez and Ms. Tavares a single photograph of Mr. McKinnon so that they would later "identify" him in a line-up.  After Ms. Alexander told Defendant Aiello that she had seen Ms. Raymond speaking with a man in a trench coat, he showed her a photo array in

which Mr. McKinnon was the only person depicted wearing such a coat.  When Ms. Alexander

told Aiello she could not make a positive identification, he declined to conduct a line-up and

instead showed Ms. Alexander video footage of Mr. McKinnon with his family.  And Defendant

Donnelly arrested Cathy Watkins after conducting an improper and highly suggestive voice

identification procedure wherein Ms. Watkins's voice was the sole sample.

123.    The Individual Defendants knew or should have known that they did not have

probable cause to arrest and prosecute Plaintiff for either homicide because they deliberately

used constitutionally impermissible practices to manufacture evidence against him that they

knew to be false.  There was no physical, circumstantial, or testimonial evidence linking Plaintiff

to either crime.  Nevertheless, on March 14, 1995, the Individual Defendants caused Plaintiff to

be indicted for both murders.

124.    The Individual Defendants procured an indictment against Plaintiff in bad faith

and conspired to charge him with falsely committing two unrelated murders in bad faith.

125.    Plaintiff is innocent and has maintained his innocence from the inception of the

criminal prosecution against him.

126.    Unfortunately, Plaintiff's wrongful conviction was not an isolated incident.  By

the mid-1990s, the NYPD was well aware that arrests and prosecutions tainted by police

falsifications were a major problem—one that had been the subject of numerous lawsuits, civil

settlements, and excoriating judicial opinions.

127.    In fact, on July 7, 1994—mere months before Plaintiff's arrest—a report by the

Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures

of the Police Department (the "Mollen Report") had noted that "[p]olice perjury and falsification

of official records is a serious problem facing the Department" that "taints arrests on the streets."

The Mollen Report referred to police falsifications as "probably the most common form of police corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful."

128.    This widespread disregard for the truth caused the wrongful conviction of Plaintiff, his co-defendants, and countless others.

**Plaintiff's Injuries and Damages**

129.    As a direct and proximate consequence of the aforementioned actions by the Defendants, Plaintiff suffered almost eighteen years of imprisonment.  During his incarceration, he sustained physical injuries—including being stabbed by another prisoner who was in the midst of a mental health crisis—and suffered abusive treatment by correctional officers.

130.    Plaintiff also suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit.  He fell into a deep depression while in prison and attempted suicide twice.  Plaintiff spent most of his 20s and all of his 30s incarcerated.  He spent what should have been the prime of his life imprisoned for crimes he did not commit.

131.    Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family members and friends.  Members of Plaintiff's family, most notably his siblings and father, believed that because Plaintiff had been accused and convicted, he must be guilty.  Thus, even though Plaintiff was innocent, his wrongful conviction caused his relationship with his family to sour.  While incarcerated, he missed his children's birthdays and was denied the opportunity to teach them to ride a bicycle.  He missed their high

school graduations.  He cried each Christmas, knowing that he could not spend the holidays with his family.  He cried each time one of his children's birthdays came around and every year on Mother's Day.  Even now, Plaintiff is only beginning to get to know his children, who are now grown.  Plaintiff's incarceration destroyed his relationship with his long-time romantic partner— the mother of his two biological children—whom he once thought of as his spouse.  One of his stepsons died while Plaintiff was incarcerated; his wrongful imprisonment deprived him of the opportunity to spend time with his stepson during the last years of the latter's life.

132.    Plaintiff was denied years of gainful employment and income.  His incarceration interrupted his education—he was training to be a nurse—and arrested his career advancement.

133.    Being incarcerated for nearly two decades a crime he did not commit destroyed Plaintiff's entire life and shattered all of his dreams.

134.    Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated.  Nothing can undo the reputational damage he has sustained.

135.    Plaintiff incurred substantial legal fees during the almost two decades he spent seeking to prove his innocence.

136.    Plaintiff was denied fundamental constitutional rights and has lost his faith in the American justice system.

## FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983; Malicious Prosecution Against Individual Defendants)

137.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138.    The Individual Defendants initiated, or caused the initiation of, criminal proceedings against Plaintiff.

139.    The Individual Defendants created false information and fabricated evidence likely to influence the grand and petit juries.  Their misdeeds include but are not limited to: (1) the Individual Defendants' fabrication of Ms. Gomez's and Ms. Tavares's statements concerning the source of non-public information they knew about the Raymond and Diop murders; (2) Defendant Aiello's fabrication of Ms. Alexander's testimony, which he and Defendant Donnelly knew to be contradicted by video evidence that they suppressed in order to mislead prosecutors; and (3) both Individual Defendants' participation in meetings with Cathy Gomez and Miriam Tavares at which their false testimony was discussed and planned.

140.    The Individual Defendants forwarded this false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Plaintiff, even though they could reasonably foresee that their actions would contribute to the prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.

141.    The Individual Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture, testimony that they intended to use against Plaintiff in criminal proceedings, and/or which they caused to be used as a basis for Plaintiff's prosecution and conviction.

142.    The Individual Defendants did so knowing that the testimony was false or was highly likely to be false, and/or with deliberate indifference to whether it was true or false.

143.    Without the false or utterly unreliable testimony that the Individual Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to prosecute and convict Plaintiff for the Diop and Raymond murders.

144.    Thus, the Individual Defendants knew that they lacked probable cause to initiate

criminal proceedings against Plaintiff.

145.    Additionally, prior to Plaintiff's conviction in 1997, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

146.    The Individual Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to disclose *Brady* material to the Bronx District Attorney's Office so that it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

147.    Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

148.    The Individual Defendants acted with actual malice, as demonstrated by, *inter alia*: their decision to falsely manufacture probable cause for Plaintiff's arrest and prosecution; their intentional and/or reckless disregard for proper investigative techniques and NYPD policies, including the use of witnesses as language interpreters for one another, failure to voucher evidence appropriately, and the use of unduly suggestive witness identification procedures; their decision to ignore valid evidence and investigative leads that pointed to Plaintiff's innocence; and their willingness to manufacture a false confession from Plaintiff.

149.    The prosecution terminated in Plaintiff's favor when his convictions were

eventually vacated and the indictment against him dismissed.

150.    The acts and conduct of the defendants constitute malicious prosecution in violation of the Fourth Amendment to the United States Constitution.

151.    Upon information and belief, the two Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

### SECOND CAUSE OF ACTION

**(42 U.S.C. §1983; Denial of Due Process and a Fair Trial Against Individual Defendants)**

152.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

153.    The Individual Defendants initiated, or caused the initiation of, criminal proceedings against Plaintiff.

154.    The Individual Defendants created false information and fabricated evidence likely to influence the Grand and petit juries.  Their misdeeds include but are not limited to: (1) the Individual Defendants' fabrication of Cathy Gomez's and Miriam Tavares's statements concerning the source of non-public information they knew about the Raymond and Diop murders; (2) Defendant Aiello's fabrication of Kim Alexander's testimony, which he knew to be contradicted by video evidence that he suppressed in order to mislead prosecutors; and (3) the Individual Defendants' participation in joint meetings with Cathy Gomez and Miriam Tavares at which their false testimony was discussed and planned.

155.    The Individual Defendants forwarded this false and fabricated information to prosecutors with the express purpose of causing criminal proceedings to be instituted against Plaintiff, even though they could reasonably foresee that their actions would contribute to the

prosecutors' subsequent decision to prosecute Plaintiff and obtain his conviction and imprisonment.

156.    The Individual Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture, testimony that they intended to use against Plaintiff in criminal proceedings, and/or which they caused to be used as a basis for Plaintiff's prosecution and conviction.

157.    The Individual Defendants did so knowing that the testimony was false or was highly likely to be false, and/or with deliberate indifference to whether it was true or false.

158.    Without the false or utterly unreliable testimony that the Individual Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to convict Plaintiff for the Diop and Raymond murders.

159.    Thus, the Individual Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff.

160.    Additionally, prior to Plaintiff's conviction in 1997, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of *Brady* material.

161.    The Individual Defendants knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) to disclose *Brady* material to the Bronx District Attorney's Office so that it could be disclosed to the defense and used to prevent the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

162.    Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material from, lied about, and otherwise failed to disclose *Brady* material to Plaintiff.

163.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of the circumstances surrounding the two murders, and of the reliability and the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

164.    The aforesaid conduct of the Individual Defendants operated to deprive Plaintiff of his right to due process and a fair trial under the Fourteenth Amendment of the United States Constitution.

165.    Upon information and belief, the two Individual Defendants knew of one another's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify one another's wrongful acts.

## THIRD CAUSE OF ACTION

### (Malicious Prosecution Claim Under New York Law Against All Defendants)

166.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

167.    Defendants Donnelly and Aiello caused the commencement and continuance of criminal proceedings against Plaintiff.

168.    There was no probable cause for criminal proceedings against Plaintiff, and Defendants Donnelly and Aiello knew or should have known as much.

169.    Defendants Donnelly and Aiello acted with actual malice.

170.    The criminal proceedings against Plaintiff terminated in Plaintiff's favor when his convictions were vacated and the indictment against him was dismissed.

171.    Defendant City is liable under the doctrine of respondeat superior for the unlawful conduct of its employees, Defendants Donnelly and Aiello.

**<u>JURY DEMAND</u>**

172.    Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1.    Compensatory damages in an amount to be determined;

2.    Punitive damages against the Individual Defendants in an amount to be determined;

3.    Pre-judgment interest as allowed by law;

4.    An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.    Such other further relief as the Court may deem just and proper.

Dated: March 11, 2014
       New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: _____
        Earl S. Ward
        Elizabeth S. Saylor
        David A. Lebowitz
    75 Rockefeller Plaza, 20th Floor
    New York, New York 10019
     (212) 763-5000


ROMANO & KUAN, PLLC
        Julia P. Kuan
    100 Lafayette Street, Suite 401
    New York, New York 10013
    (212) 274-0777


*Attorneys for Plaintiff*